IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

THOMAS D. SAILORS,

                    Plaintiff,

         vs.

DANIEL KEYES, Special Administrator of
the Estate of Paul Keyes, US Marshal
#3483, in their individual capacities;
UNITED STATES OF AMERICA, UNITED
STATES MARSHAL SERVICE, and
UNITED STATES ATTORNEY GENERAL,

                    Defendants.

8:18CV189


MEMORANDUM AND ORDER

This matter is before the Court on the motion of defendant, Daniel Keyes, Special Administrator of the Estate of Paul Keyes ("the Estate"), to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or for a summary judgment of dismissal under Rule 56(a) of the Federal Rules of Civil Procedure, Filing No. 79.  Also, before the Court are the plaintiff's motions to strike portions of various witnesses' affidavits.  Filings Nos. 87, 88, and 96.

I.    BACKGROUND

This is an action for deprivation of constitutional rights under 28 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971),[1] in connection with an officer-involved shooting during the attempted arrest of the plaintiff in Lincoln, Nebraska, on January 5, 2018.  Sailors alleges that Deputy United States Marshal ("Deputy Marshal") Paul Keyes, who is now deceased, used

---

[1] *Bivens* actions are implied causes of action for damages for constitutional violations against federal government officials in their individual capacities. *Carpenter's Produce v. Arnold*, 189 F.3d 686, 687 (8th Cir. 1999).  .

excessive force in attempting to arrest him.  He alleges Keyes deprived him of the right to be "free from the use of excessive force by law enforcement" under the Fourth Amendment and subjected to "punishment without due process," in violation of the Fifth Amendment.

In his second amended complaint, the plaintiff alleges he was asleep in the driver's seat of a GMC Yukon SUV in a parking lot when Deputy Marshal Keyes shot and wounded him.  He contends Deputy Marshal Keyes had no objective reason to begin shooting and using deadly force in an attempt to apprehend Sailors, as he had taken no action to place Deputy Marshal Keyes or any other officer in danger.  He states he was not aware that law enforcement officers were attempting to detain him until after he had been shot.  *See* Filing No. 60, Amended Complaint (Second) at 2-3.

The Estate first moves to dismiss Sailors's due process claim, arguing that excessive force claims must be brought under the Fourth Amendment, rather than the Fifth Amendment.  The plaintiff agrees with that contention and the Court will accordingly grant the defendant's motion to dismiss the plaintiff's Fifth Amendment claim.

The defendant next argues it is entitled to a summary judgment of dismissal on Sailors's Fourth Amendment excessive force claim.  It argues that uncontroverted evidence shows that Deputy Marshal Keyes entitled to qualified immunity.  The Estate argues that it is uncontroverted that on January 5, 2018, Sailors was wanted on a felony warrant, had a significant history of evading law enforcement, and was thought by law enforcement to be armed.  It contends that when law enforcement officers attempted to arrest Sailors, he used his vehicle as a deadly weapon, reversing at a high rate of

speed into a police cruiser and endangering the officers.  It argues that Deputy Marshal Keyes's action in shooting at the SUV was objectively reasonable.

In support of its motion, the defendant submits affidavits and sets out sixty-seven separately numbered paragraphs of material undisputed facts.[2]  The Estate also relies on evidence, including a dash camera ("dash-cam") video recording of the incident, submitted in connection with a motion to dismiss or for summary judgment filed by defendant Lincoln Police Department ("LPD") Officers Maxwell Hubka and Cole Jennings.[3]  Sailors moves to strike parts of the affidavits for lack of foundation and as inadmissible hearsay.  Specifically, he objects to parts of Officer Hubka's affidavit and to the transcript of an interview of Deputy Marshal Keyes, which is attached to the affidavit of LPD Investigator Matthew Franken.  *See* Filing Nos. 87 and 96.[4]  The Estate responds that the materials can be submitted in admissible form at trial.

In response to the Estate's motion for summary judgment, Sailors contends that there are genuine issues of material fact.  He argues that reasonable persons viewing the evidence, including a dash cam video recording of portions of the incident, could come to different conclusions as to when the shooting began and whether the officers were in imminent danger.

---

[2] The plaintiff disputes eleven of those paragraphs (paragraphs 3, 5, 7, 12, 13, 27, 37, 46, 47, 48 and 57).  The challenged statements relate primarily to the officers' motivations and perceptions.  The Court did not rely on any disputed factual statements.  The dashcam video of the event is the best evidence of what occurred and the Court relies primarily on that evidence.

[3] Those defendants were later dismissed without prejudice on plaintiff's motion.  *See* Filing No. 100.

[4] In Filing No. 88, the plaintiff moves to dismiss portions of the affidavit of LPD Investigator Jeremy Schwartz.  The defendant does not rely on Investigator Schwartz's affidavit in its motion and the Court will deny the motion to strike as moot.

II.    FACTS

The following facts are gleaned from the parties' respective statements of undisputed material facts.  *See* Filing No. 81, Defendant's Brief at 2-14; Filing No. 92, Plaintiff's Brief at 1.  The parties agree to the following.  Paul Keyes was a Deputy United States Marshal and was employed by the United States Marshals Service (USMS) in that capacity for approximately 15 years.  Deputy Marshal Paul Keyes passed away from cancer on February 12, 2018.

Beginning in November 2017, Deputy Marshal Keyes became familiar with Sailors when Deputy Marshal Keyes was involved in a pursuit with a vehicle in which Sailors was a passenger.  On December 8, 2017, Sailors was charged with a felony drug-related offense and a warrant was issued for his arrest in Gage County, Nebraska. After the warrant was issued, law enforcement was attempting to take Sailors into custody.

During the morning of January 5, 2018, law enforcement officials attempted to apprehend Sailors by way of traffic stops.  On two separate occasions Sailors successfully eluded law enforcement—at excessive speeds—in a stolen Yukon SUV. Deputy Marshal Keyes learned that Sailors had evaded law enforcement approximately 6 times in the days prior to January 5, 2018, at extremely high rates of speeds and while driving erratically.  On January 5, 2018, Deputy Marshal Keyes unsuccessfully attempted to locate Sailors at various addresses in Lincoln, Nebraska, until approximately 7:45 p.m.  On the evening of January 5, 2018, at approximately 8:00 p.m., Deputy Marshal Keyes located Sailors while driving in Lincoln, Nebraska, and began to follow him.  Deputy Marshal Keyes was driving a 2015 White Chevy Silverado truck with a "grill guard" on the front.

At approximately 8:00 p.m. that evening, Deputy Marshal Keyes called LPD Officer Maxwell Hubka and informed Officer Hubka that he had happened across Sailors while driving in Lincoln, Nebraska, and was following him.  Keys also informed Hubka that Sailors was an individual whom the USMS had been attempting to apprehend for a period of days and was wanted on a felony warrant.  Deputy Marshal Keyes informed Officer Hubka that Sailors was driving a stolen SUV—a GMC Yukon— and requested assistance on executing a felony arrest warrant.

In the days leading up to January 5, 2018, and during LPD's lineup in the afternoon of January 5, 2018, Officer Hubka learned that the USMS had been attempting to locate and/or apprehend Sailors but had been unsuccessful in doing so. Officer Hubka also learned about Sailors's criminal history.  Officer Hubka also learned that Sailors had an outstanding felony arrest warrant, had fled from law enforcement on numerous occasions, at least 20 times, and was possibly armed with a firearm.  The information Officer Hubka received detailed the need for Sailors's apprehension by law enforcement.  Based on that information, Officer Hubka believed that Sailors was wanted, dangerous, unlikely to cooperate with law enforcement officers, and likely to be armed.

After receiving the 8:00 p.m. call from Deputy Marshal Keyes, Officer Hubka and his partner, LPD Officer Cole Jennings, departed from LPD Headquarters in a marked LPD Ford Explorer cruiser.  Officer Hubka was the driver and Officer Jennings was in the front passenger seat.  While driving to assist Deputy Marshal Keyes, Officer Hubka and Deputy Marshal Keyes were in telephone contact.  Deputy Marshal Keyes provided Officer Hubka updates on Sailors's location and informed Officer Hubka that Sailors was swerving and otherwise driving poorly, as if he were under the influence of drugs.

Eventually, Deputy Marshal Keyes told Officer Hubka that Sailors had pulled into a parking lot between buildings near the intersection of South 17thStreet and Prospect Street in Lincoln, Nebraska.  The parking lot was adjacent to 1634 Prospect Street in Lincoln, Nebraska.  Deputy Marshal Keyes informed Officer Hubka that they were going to utilize their vehicles to "box in" Sailors's vehicle.  Deputy Marshal Keyes was going to use his vehicle to block the front of Sailors's vehicle and requested Officer Hubka use his vehicle to block the rear of Sailors's vehicle in an attempt to prevent Sailors from fleeing.  This is known as the "box in" technique.  Officer Hubka believes it was appropriate to assist Deputy Marshal Keyes with the "box in" technique as it would reduce the opportunity for Sailors to flee and because Sailors was known to have previously fled from law enforcement multiple times and he was believed to be armed and considered dangerous.

Portions of the arrest attempt, including the "box in" maneuver of Sailors's SUV, Sailors's flight from arrest, and ensuing high speed chase is captured on a dash camera that was recording in Officer Hubka's patrol vehicle.  As shown in Officer Hubka's dash camera video, after Deputy Marshal Keyes informed Officer Hubka that they were going to "box in" Sailors's SUV, Deputy Marshal Keyes continued northbound on South 17th Street so that his vehicle would enter the alley allowing him to box in the front of Sailors's SUV.  Officer Hubka turned westbound from South 17th Street onto Prospect Street to box in the rear of Sailors's SUV.  The parking lot was fairly open with two vehicles located near the southwestern portion of the lot.  Sailors's SUV was parked in the middle of the parking lot at an angle with its brake lights on.

Just as Deputy Marshal Keyes's truck is seen entering the screen on Officer Hubka's dash camera, the brake lights on Sailors's SUV cycle off, then back on.  Just

after Sailors's brake lights turn off, then back on, Deputy Marshal Keyes activates his emergency lights. The emergency red and blue lights are clearly visible on Deputy Marshal Keyes's truck. After the initiation of Deputy Marshal Keyes's emergency lights, Sailors's brake lights again turn off, then back on, then back off. While this is occurring, Officer Hubka parked his marked patrol vehicle within approximately one foot of the rear of Sailors's stolen SUV but was not making contact with Sailors's vehicle. While Sailors's SUV's brake lights were off, Deputy Marshal Keyes's vehicle makes contact with the front of Sailors vehicle causing the brake lights to again cycle on, then off.

Sailors admitted he knew Deputy Marshal Keyes's white truck. He knew it was the "U.S. Marshals" and he had encountered the truck before in Beatrice, Nebraska. After stopping his cruiser and placing it in park, Officer Hubka exited his cruiser and stood in the area created between the open driver's door and the cruiser. He drew his weapon and began giving commands to Sailors to turn off his vehicle. Officer Hubka's weapon was outfitted with a tactical flashlight, which was operative. The tactical light on Officer Hubka's gun can be seen in the video on the left rear of Sailors's vehicle. Similarly, once Officer Hubka parked his cruiser, Officer Jennings exited the passenger side of the cruiser, drew his weapon, and began to give commands to Sailors to exit the vehicle. Officer Hubka heard the engine of Sailors's vehicle revving, sounding like it was at full speed.

With Sailors's vehicle pinned by Deputy Marshal Keyes's truck at the front and Officer Hubka's patrol vehicle at the rear, Sailors's brake lights repeatedly cycle on and off until he suddenly revved his engine, placed the SUV into reverse, and sent his vehicle speeding backwards and hitting Officer Hubka's patrol vehicle. Just as the

7

vehicle started in reverse, Officer Hubka activated his patrol vehicles' overhead emergency lights.

As Sailors's vehicle was revving its engine and moving backwards, Officer Hubka who was still outside his cruiser in the area between the door and the cruiser, heard yelling and believed Deputy Marshal Keyes was yelling to him to "get out of there" or "move." While Sailors's vehicle was smashing the patrol vehicle and ramming it backwards, Officer Hubka, who was now trapped between his door and the cruiser, became off balance because his cruiser's driver side door was hitting his legs. To avoid being knocked to the ground and run over by Sailors's vehicle, Officer Hubka was forced to dive back into the driver's seat of his cruiser and hold onto the seat. At this point, his upper body was in his cruiser while his legs were dragging along the ground on the outside of his cruiser. Officer Hubka was eventually able to pull himself completely into the cruiser. Officer Hubka believed he was facing imminent serious injury or death.

Simultaneously, at or near the time Sailors sped backwards hitting Officer Hubka's patrol vehicle and ramming it backwards, Deputy Marshal Keyes began discharging his firearm at Sailors. Neither Officer Hubka nor Officer Jennings discharged their weapons. Sailors used the force of his SUV to push Officer Hubka's vehicle back approximately 15-20 feet and accelerated at a high rate of speed eventually crashing into another vehicle parked in the lot and an apartment building bedroom. As depicted in a photo in evidence, these collisions caused significant damage to both the car and apartment complex. *See* Filing No. 75-1, Ex. 2, Affidavit of Maxwell Hubka ("Hubka Aff."), Ex. B. Deputy Marshal Keyes continued to discharge his

8

firearm at Sailors as he was speeding in reverse, crashing into vehicles, and attempting to evade arrest.

Officer Hubka was eventually able to gain control of his patrol vehicle, and concerned that Sailors was armed, Officer Hubka moved his cruiser into a position that would not be directly in front of Sailors SUV which was crashed and stuck inside the apartment building.   Once in this position, Officer Hubka again exited his cruiser, drew his weapon, and radioed for additional police officers to assist.   Officer Hubka was able to see Sailors sitting in the driver's seat of his vehicle which had crashed into the apartment building, with his hands flailing about making frantic movements.   Sailors was screaming and was also revving the engine of the SUV, which sounded to be at full speed.   Most of Sailors's vehicle was backed into the bedroom of the apartment building.   Officer Hubka believed there was a high likelihood that Sailors would resort to lethal force to again evade police in light of the fact that Sailors had rammed his police cruiser and had attempted to run him over.

With Sailors's vehicle crashed into the apartment building, Officer Hubka was behind and to the right of Deputy Marshal Keyes.   Officer Jennings was behind and to the left of Deputy Marshal Keyes. They began advancing on Sailors.   Officer Jennings and Deputy Marshal Keyes were shouting for Sailors to exit the vehicle.   As the officers were advancing on Sailors's vehicle, Deputy Marshal Keyes began to again discharge his firearm.

Sailors was able to shift his vehicle into drive and fled from the scene causing Officer Hubka, Officer Jennings, and Deputy Marshal Keyes to retreat to their vehicles and engage in pursuit.   Deputy Marshal Keyes was the primary pursuit officer.   Officer Hubka and Officer Jennings assisted in their damaged cruiser and another officer from

9

LPD also provided assistance.  Sailors led law enforcement officers on a pursuit that reached dangerous speeds on icy and snow-packed streets throughout the City of Lincoln.  Due to the damage on Sailors's vehicle, he had no operative lights on the rear of his SUV.  Because of the dangerous conditions of the pursuit created by Sailors's operation of the stolen Yukon, LPD ordered the pursuit terminated via broadcast over the police radio.  Upon receiving this broadcast, Officer Hubka immediately terminated pursuit.

After Officer Hubka and Officer Jennings terminated the pursuit, they began proceeding back towards the parking lot where Sailors initially evaded arrest.  While they were driving back, they were informed by police dispatch that Sailors's SUV was at the front entrance of Bryan West Medical Center in Lincoln, Nebraska.  Officer Hubka and Officer Jennings proceeded to the hospital.  Upon arrival to the hospital, multiple officers had surrounded Sailors in his now severely damaged SUV and ordered him out of the vehicle.  Sailors complied.  LPD officers, including Officer Hubka, were able to summon medical attention for Sailors and he was taken from the scene by medical personnel.   As a result of his cruiser being rammed by Sailors and subsequently being dragged, Officer Hubka sustained pain and an abrasion to his shin.

Deputy Marshal Keyes fired a total of approximately 19 shots with his personal handgun, a Glock 30S.  The entirety of the events in the parking lot took approximately 47 seconds.

Deputy Marshal Keyes's use of a Glock 30S during the incident would be authorized under USMS Policy Directive 14.11, subject to completion of qualifying standards for the weapon's use as a primary, secondary, or off-duty handgun.  Additionally, the Glock 30S has similar functionality as Deputy Marshal Keyes's service

weapon, a Glock 22. Deputy Marshal Keyes would have been permitted by USMS policy to utilize a personally owned handgun in the course of his official duties as a "secondary or off-duty handgun" provided he qualified on the handgun in accordance with USMS policy. Additionally, the policy permits the usage of certain personally owned handguns as a primary weapon, provided a Deputy Marshal qualifies on the weapon in accordance with Policy Directive 14.11. A failure to qualify a secondary or off-duty handgun prior to use in the course of official duties would be a violation of USMS Policy Directive 14.11(D)(2) and could lead to administrative sanction.

As a result of the actions for which Sailors now sues, he was criminally charged with Second Degree Assault on an Officer, a Class 2 Felony; Use of a Deadly Weapon to Commit a Felony, a Class 2 Felony; Theft by Unlawful Taking, $5,000 or more, a Class 2A Felony, and Operate Motor Vehicle to Avoid Arrest, a Class 4 Felony. The case was captioned as *State of Nebraska v. Thomas Sailors*, District Court of Lancaster County, Nebraska, CR18-189. On March 27, 2019, the State of Nebraska filed an Amended Information charging Sailors with Third Degree Assault on an Officer, a Class 3A Felony; and Operate Motor Vehicle to Avoid Arrest, a Class 4 Felony. On March 27, 2019, Sailors pled no contest to the two counts in the Amended Information and was found guilty by the Court of the two felony counts. On April 30, 2019, Sailors was sentenced to 3 years of imprisonment on the Third-Degree Assault of an Officer charge and 2 years of imprisonment on the Operating a Motor Vehicle to Avoid Arrest charge.

The Court's review of the record shows that Officer Hupka's dashcam video recorded the incident. Filing No. 75-1, Ex. 2, Hubka Aff., Ex. A. The Court has reviewed the digital recording and finds that it conforms to the description of the episode agreed to by the parties and set forth above.

11

III.   LAW

A.   Summary Judgment Standards

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380 (2007); see Fed. Rule Civ. Proc. 56(c). The Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587 (1986) (footnote omitted)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986).

"Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004). Whether the evidence viewed in the light most favorable to the plaintiff shows that a defendant violated a plaintiff's clearly established rights under the Fourth Amendment is purely a legal question. Kelsay v. Ernst, 933 F.3d 975, 979 (8th Cir. 2019), cert. denied, No. 19-682, 2020 WL 2515455 (U.S. May 18, 2020). However, "if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Turney v. Waterbury, 375 F.3d 756, 759-760 (8th Cir. 2004) (quotations omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

12

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380 (finding the lower court should not have relied on a version of the story told by the plaintiff, but "should have viewed the facts in the light depicted by the videotape."); *see also Boude v. City of Raymore,* 855 F.3d 930, 933 (8th Cir. 2017) (stating that although the court views the facts most favorably to the non-movant in deciding a motion for summary judgment on qualified immunity grounds, "it need not adopt her factual allegations where a video 'blatantly contradicts' her version of events").

B.    Qualified Immunity

The law imposes civil liability on any person who "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. However, state actors, such as police officers, are protected from § 1983 suits by the affirmative defense of qualified immunity. *Waters v. Madson,* 921 F.3d 725, 734 (8th Cir. 2019). The qualified immunity analysis is identical under either a *Bivens* cause of action or a suit under § 1983. *Wilson v. Layne,* 526 U.S. 603, 609 (1999).

The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law. *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). "Qualified immunity shields a government official from suit under § 1983 if his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kelsay v. Ernst,* 933 F.3d 975, 979–80 (8th Cir. 2019) (en banc), *cert. denied,* No. 19-682, 2020 WL 2515455 (U.S. May 18, 2020) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

"'Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Qualified immunity "is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).   "Because qualified immunity protects officers from suit, not merely from liability, courts should 'resolv[e] immunity questions at the earliest possible stage in litigation.'" *Waters*, 921 F.3d at 734 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).   The defense "is usually raised by a motion for summary judgment after a limited amount of discovery has been conducted to determine whether defendants acted objectively in a reasonable manner and whether a plaintiff's rights were clearly established at the time of the alleged deprivation." *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

In determining whether an officer is entitled to qualified immunity, a court asks (1) whether, taking the facts in the light most favorable to the injured party, the alleged facts demonstrate that the official's conduct violated a constitutional right; and (2) whether the asserted constitutional right was clearly established at the time of the defendant's alleged misconduct. *Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1074 (8th Cir. 2018), *as corrected* (Mar. 6, 2018), *cert. denied sub nom. Burningham v. Raines*, 139 S. Ct. 787 (2019).   For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   "A right is 'clearly established' only if the violation was 'beyond debate' such

14

that only a plainly incompetent officer or a knowing lawbreaker would engage in the alleged misconduct." *Johnson v. McCarver,* 942 F.3d 405, 409 (8th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).   In other words, the law at the time of the events in question must have given the officer "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The state of the law should not be examined at a high level of generality. *Kelsay,* 933 F.3d at 979.   "'The dispositive question is whether the violative nature of particular conduct is clearly established.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted)).   Specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine of excessive force will apply to the factual situation the officer confronts. *Id.* at 979-80.   "'Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Id.* at 980 (quoting *Kisela,*138 S. Ct. at 1153 (internal quotation marks omitted)); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (stating the clearly established right must be defined with specificity).

An officer's shooting of a person constitutes a seizure under the Fourth Amendment. *Estate of Morgan v. Cook*, 686 F.3d 494, 496 (8th Cir. 2012).   Claims of excessive use of force implicate the Fourth Amendment's protections against unreasonable seizures and are analyzed under an "objective reasonableness standard." *Sanders v. City of Minneapolis,* 474 F.3d 523, 526 (8th Cir. 2007).   An officer's use of force violates the Fourth Amendment if it is "objectively unreasonable." *Tatum v. Robinson*, 858 F.3d 544, 547 (8th Cir. 2017).   The Court "examine[s] 'whether the

15

officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Molina-Gomes v. Welinski*, 676 F.3d 1149, 1152 (8th Cir. 2012) (quoting *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005) (citation omitted)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The reasonableness of an officer's use of force is evaluated by looking at the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight. *Raines*, 883 F.3d at 1074; *see also Tatum*, 858 F.3d at 547.  Deadly force is not justified "where a person 'poses no immediate threat to the officer and no threat to others[.]'" *Raines*, 883 F.3d at 1074 (quoting *Ellison v. Lesher*, 796 F.3d 910, 916 (8th Cir. 2015)).  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Given a quickly evolving scenario, an officer's actions in shooting at a vehicle in an attempt to stop a suspect from injuring an officer in his path is objectively reasonable and does not violate Fourth Amendment right to be free from unreasonable seizures. *Sanders*, 474 F.3d at 526.  Reckless driving in an attempt to escape can be a danger to the arresting police officers and to any drivers on the roadway. *Molina-Gomes,* 676 F.3d at 1152-53 (holding an officer's decision to fire on driver without warning was objectively reasonable where driver sped backwards, dragging another officer along and knocking him to the ground); *see also Scott*, 550 U.S. at 381 (finding it objectively

reasonable for a law enforcement officer to terminate a car chase by ramming his bumper into fleeing suspect's vehicle because the suspect "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase"). The inquiry for the Court in evaluating use of deadly force is to "specifically identify[ ] the plaintiff-friendly version of the disputed facts, rather than . . . simply recite the parties' general allegations" and then to evaluate whether the officer, in light of all of the information available to him at the moment, violated clearly established law when he shot the plaintiff. *N.S. v. Kansas City Bd. of Police Comm'rs*, 933 F.3d 967, 970 (8th Cir. 2019); *see also Kisela*, 138 S. Ct. at 1152–53.

III.    DISCUSSION

As a threshold matter, the Court first finds that the plaintiff's motions to strike need not be addressed. Notwithstanding that the defendant has shown that the challenged statements could likely be presented in admissible form at trial, the Court did not rely on any evidence that the plaintiff moved to strike.[5] The Court's resolution of this matter is based on the facts agreed to by the parties and the Court's review of the dash cam video. Accordingly, the motions to strike will be denied as moot.

The record shows that Deputy Marshal Keyes was aware that Sailors had been charged with a felony drug offense and had eluded law enforcement six times, at high speeds and while driving erratically, in the days immediately preceding the incident.

---

[5] "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party objects under Federal Rule of Civil Procedure 56(c)(2), contending that the material cited to support a fact cannot be presented in a form that would be admissible in evidence, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Gannon Int'l Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citation omitted).

Sailors was driving a stolen vehicle and was swerving and otherwise driving poorly as if under the influence of drugs. He was known to have previously fled from law enforcement and he was believed to be armed and dangerous. Sailors admitted he knew Deputy Marshal Keyes's unmarked USMS truck—he had encountered it before in Beatrice, Nebraska. The record shows the LPD officers and Deputy Marshal Keyes had agreed to use a box-in technique to apprehend Sailors.

Officer Hupke's dashcam recorded Deputy Marshal Keyes following Sailors up until shortly before the incident. The video recording shows the SUV taillights flash just as the Deputy Marshal comes around the corner and as the LPD cruiser is coming up behind the SUV. Deputy Marshal Keyes does not turn on his flashing lights until he is directly in front of Sailors's vehicle, and just before his truck bumps into the front of the SUV. The LPD cruiser does not activate its lights until after the bump and Sailors starts to back up. The sound on the video begins at the same time as the LPD cruiser's lights, which is when Sailors starts backing up.

Deputy Marshal Keyes is shooting as Sailors rams the cruiser and pushes it back. The shots are audible as Sailors rams the cruiser. After Sailors clears the cruiser, he rams other parked cars with the SUV and crashes through the brick wall of an apartment building. Deputy Marshal Keyes stops shooting as Sailors's SUV is in the line of fire between Deputy Marshal Keyes and the LPD cruiser. Deputy Marshal Keyes had emptied his 9-round magazine and one chambered round during the ramming. After Sailors's vehicle breaks through the wall of the apartment building, Deputy Marshal Keyes reloads. As Sailors's SUV speeds from the apartment building through the demolished wall, Deputy Marshal Keyes shoots again at the vehicle, emptying his second magazine. The parties agree that 19 shots were fired in total.

18

Sailors then led the officers on a high-speed pursuit on somewhat icy residential streets through the City of Lincoln.

The video shows that shortly after Deputy Marshal Keyes activated his lights and bumped the SUV, Sailors revved the engine and reversed at a high-speed, crashing into the LPD cruiser.  The video does not support Sailors version of events, that is, that he was sleeping and woke up to being shot.  The video demonstrates that Sailors was not asleep because his taillights were intermittently lighting up, which is consistent with repeatedly applying the brakes and later shifting into reverse.  If Sailors had been sleeping, he would have awoken when his truck was bumped.  As the video clearly demonstrates, after the bump Sailors would have seen police lights in front and behind.  Then, as he has consistently done, he decided to flee the scene regardless of the risk to the officers or the public.  The entire parking-lot episode took place in the course of forty-seven seconds.  The video shows Deputy Marshal Keyes is shooting as Sailors reverses at high speed into the LPD cruiser.  The photographic evidence confirms that Sailors then crashes into at least one other vehicle and demolishes the wall of an apartment building.  Under these circumstances, it was objectively reasonable to believe that Sailors posed a danger to the arresting cruiser officers and the public.

Based on the undisputed facts, Deputy Marshal Keyes had probable cause to believe that Sailors posed a threat of serious physical harm to the officers at the scene and the general public, specifically anyone living on the ground floor of the apartment building.  Nothing supports the plaintiff's bald allegation that he was asleep when Deputy Marshal Keyes shot him, in fact, that contention is belied by the evidence in the video.  The video clearly depicts a situationally alert plaintiff and shows him driving in such a fashion as to endanger human life.  Sailors's version of events is discredited by

19

the record and no jury could believe his allegations.  There is no "genuine" dispute about the facts.

Under the circumstances, Deputy Marshal Keyes's use of force was not objectively unreasonable.  A warrant had been issued for Sailors's arrest for a serious felony offense, he actively attempted to evade arrest by crashing into a police cruiser with an officer next to it, crashed into another car and a building while fleeing, and led officers on a dangerous chase.  He clearly posed an immediate threat to the safety of officers and the public.

At the time of the incident in 2018, it had long been clearly established, in the context of reckless use of a vehicle to escape, as a weapon, or in a high speed chase, that where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using potentially deadly force.  *See, e.g., Garner*, 471 U.S. at 1; *Scott*, 550 U.S. at 381; *Sanders*, 474 F.3d at 526; and *Molina-Gomes*, 676 F.3d at 1152-53.  Because the record shows Deputy Marshal Keyes had probable cause to believe Sailors posed a threat of serious physical harm to the officers or others, he did not violate clearly established law by shooting at Sailors's stolen vehicle as it was reversing at high speed into Officer Hubke's cruiser, or as it was recklessly fleeing the scene.  Accordingly, the Estate has shown that Deputy Marshal Keyes is entitled to qualified immunity from suit and the Estate is not liable to the plaintiff. Accordingly,

IT IS ORDERED that:

1.      The plaintiff's motions to strike (Filing Nos. 87, 88, and 96) are
        denied as moot.

20

2.      The defendant's motion for summary judgment (Filing No. 79) is

        granted.

3.      This action is dismissed.

4.      A judgment of dismissal will issue.

Dated this 25th day of June, 2020.

BY THE COURT:

s/ Joseph F. Bataillon_____
Senior United States District Judge
